# UNITED STATES DISTRICT COURT
## DISTRICT OF NEVADA

| | |
|---|---|
| BRANCH BANKING AND TRUST COMPANY, a North Carolina banking corporation,<br><br>  Plaintiff,<br><br>  vs.<br><br>MICHAEL E. JARRETT, an individual; D. GERALD BING, JR., an individual; D. GERALD BING, JR., Trustee of the D. GERALD BING, JR. TRUST dated January 17, 2000; and DOES 1 through 10, inclusive,<br><br>  Defendants. | 3:13-cv-00235-RCJ-VPC<br><br>**ORDER** |

This case arises out of a default on a commercial loan and the failure of three guarantors to honor a guarantee on the loan. Plaintiff Branch Banking and Trust Company has moved for: (1) partial summary judgment as to the applicability of certain defenses, (ECF No. 34); (2) leave to file excess pages, (ECF No. 35); and (3) summary judgment on its claim for breach of the guarantee and damages in the amount of $3,488,129.29, (ECF No. 53). For the reasons stated herein, the Court grants each of Plaintiff's motions and awards damages in the amount requested.

## I.    FACTS AND PROCEDURAL HISTORY

The following facts are undisputed. Colonial Bank, N.A. ("Colonial") loaned Clock Tower Center, LLC ("Clock Tower") $3,400,000 in exchange for a promissory note (the "Note"). (Compl. ¶ 12, May 07, 2013, ECF No. 1). Clock Tower's obligations were secured by a deed of trust (the "Deed of Trust"), which collateralized real property located in Gardnerville, Nevada (the "Property"). (*Id.* ¶ 14). Clock Tower's indebtedness was further secured by an

unconditional guarantee (the "Guarantee"), executed by three guarantors: Defendants Jarrett, Bing, and the Bing Trust (collectively, "Defendants" or "Guarantors"). (*Id.* ¶ 15). Guarantors Jarrett and Bing hold a combined 67.5% interest in Clock Tower, LLC. (Am. Statement of Financial Affairs, ECF 25-1, at 10).

In the Guarantee, Guarantors waived several rights, including: (1) "any defense based upon any statute or rule of law which provides that the obligation of a surety must be neither larger in amount nor in other respects more burdensome than that of the principal." (Guarantee § 5(e), ECF No. 20-1, at 4); and (2) "all rights and defenses arising out of an election of remedies by Lender," (*id.* at § 5(d)). Guarantors further agreed that any bankruptcy proceeding involving Clock Tower would not affect their unconditional promise of repayment. (*Id.* at § 7). Finally, Guarantors agreed that their obligations would not be released until the full indebtedness was paid:

> Lender's rights hereunder shall not be exhausted by its exercise of its rights or remedies or by any such action or by any number of successive actions until and unless all indebtedness and obligations, the payment and performance of which are hereby guaranteed, have been paid and fully performed.

(*Id.* at § 11).

Colonial's interest in the loan was ultimately acquired by Plaintiff Branch Banking and Trust Company ("BB&T"). (Compl. ¶¶ 18–21, ECF No. 1). When the Note matured in April 2011, neither Clock Tower nor the Guarantors honored their promises under the Note and Guarantee (Nikonchuk Decl. ¶ 6, ECF No. 26). Instead, on November 16, 2011, Clock Tower petitioned for Chapter 11 bankruptcy in the U.S. Bankruptcy Court for the District of Nevada. (Lukas Decl. ¶4, ECF No. 34-2). BB&T participated in the bankruptcy as Clock Tower's largest creditor. (*Id.*). Guarantors Bing and Jarret also participated in the proceedings. Jarret, as Clock Tower's manager, verified the contents

2

of Clock Tower's plan and disclosure statement, signed Clock Tower's bankruptcy petition and monthly operating reports, and provided live testimony. (Debtor's Plan, ECF No. 43-3, at 23; Summ. of Financial Status, ECF No. 54-1; Debtor's Disclosure Statement, ECF No. 54-2; Tr. of Proceedings, ECF No. 54-3; Voluntary Pet., ECF No. 54-4). And, as explained below, Bing submitted a critical declaration. (*See* Bing Decl., ECF No. 43-7).

During the bankruptcy proceedings, Clock Tower did not dispute the validity or amount of its debt to BB&T. Instead, it asserted that BB&T possessed a Class 1A secured claim "in the approximate unpaid principal sum of $3,400,000, plus accruing interest at the contractual rate" as well as an unsecured claim. (Debtor's Plan, ECF No. 43-3, at 12). Clock Tower also argued that BB&T had a viable third-party source of recovery through the Guarantee. Specifically, and with Guarantors' participation, Clock Tower successfully separated BB&T's claims from the other creditors' claims in order to obtain the voting necessary to confirm its plan over BB&T's objection. (*See* Reply to Objection to Confirmation, ECF No. 43-6, at 6–7, 9–11; Debtor's Ballot Summary, ECF No. 54-5). The other creditors were largely related to the Guarantors—e.g., Bing Materials, Jarrett Construction, Jerry Bing, Niki Jarrett, (Debtor's Plan, ECF No. 43-3, at 24). To separate BB&T's claims, Clock Tower argued that BB&T belonged to a different class than the other creditors because it could recover under the Guarantee:

> In the present case, BB&T's claim is personally guaranteed to be paid by Michael Jarrett, D. Gerald Bing, Jr. ("Bing") and D. Gerald Bing, Jr., Trustee of the D. Gerald Bing, Jr. Trust dated January 17, 2000 ("Bing Trust"), which Guaranty is dated January 25, 2008, and is attached hereto as Exhibit A and incorporated herein by that reference . . . . None of the Class 3 unsecured creditors possess these personal guarantees or security instruments to enforce payment on their claims. Although Michael Jarrett's personal guaranty is essentially of no value because he possesses no non-exempt assets, the other guarantors, Bing and

the Bing Trust, possess non-exempt assets valued in excess of $1,000,000.00. See the Declaration of D. Gerald Bing attached hereto as Exhibit C, which attests to the fact that his current non-exempt real and personal property assets are valued in excess of $1,000,000.00.

(Reply to Objection to Confirmation, ECF No. 43-6, at 6). Clock Tower further asserted that "with the attached Declaration of D. Gerald Bing, [it] ha[d] shown that BB&T ha[d] a viable source of payment for the unsecured portion of its claim from third-party sources." (*Id.* at 7). It repeated this contention at a hearing before the bankruptcy court. (Tr. of Proceedings, ECF No. 54-7, at 4–5). The bankruptcy court agreed and emphasized the significance of Bing's declaration: "[T]he classification of BB&T's unsecured claim as a Class 1B unsecured claim separate from Class 3 unsecured claims was appropriate under the circumstances, because of the significance of the guaranty of D. Gerald Bing." (Order Confirming Plan of Reorganization ¶ 27, ECF No. 43-1, at 9). Clock Tower's other creditors voted to approve the plan. (Debtor's Ballot Summ., ECF No. 54-5).

On April 3, 2013, the bankruptcy court entered an order confirming Clock Tower's plan for reorganization (the "Bankruptcy Plan"). (Order Confirming Plan of Reorganization, ECF No. 43-1). The relevant elements of the Bankruptcy Plan are as follows: (1) BB&T has a reduced secured claim for $2,960,000, which reflects the decreased value of the Property; (2) BB&T has an unsecured deficiency claim for $297,045, which represents the difference between Clock Tower's indebtedness to BB&T at the time it filed for bankruptcy and the decreased value of the Property; (3) both claims are payable over six years, from March 2013 to February 2019, in monthly payments; (4) Clock Tower is not liable for any interest accruing after the filing of its 2011 petition; (5) Clock Tower is presumed to be able to comply with the bankruptcy plan without default, liquidation, or further financial reorganization; and (6) BB&T retains its lien rights

against the property but cannot enforce those rights unless Clock Tower defaults under the plan. (*Id.* ¶¶ 7, 9, 16, 22, 6(A)). Accordingly, under the Bankruptcy Plan, Clock Tower retains title to and possession of the Property and will make monthly payments on its reduced debt (now $3,257,045 instead of the agreed $3,400,000 and associated interest) until February 2019. During that time, the plan freezes BB&T's ability to collect interest or foreclose on the Deed of Trust.

On May 7, 2013, BB&T filed this action to enforce the Guarantee, arguing that because Clock Tower has failed to satisfy its obligations under the Loan Documents, the Guarantors are jointly and severally liable for the entire amount originally due on the Note. (Compl. ¶ 28, ECF No. 1). The parties do not dispute that the total underlying debt is presently $3,488,129.29. (*See* Reply, ECF No. 65, at 3).

On October 22, 2013 this Court entered an order granting Guarantors' motion for an evidentiary hearing pursuant to NRS § 40.495(4) and denying Guarantors' motion for partial summary judgment as to BB&T's claim for attorney fees and costs for its efforts in the bankruptcy proceedings. (Order, ECF No. 3, at 11). On October 25, 2013, prior to the evidentiary hearing, BB&T filed the pending motion for partial summary judgment, seeking (1) summary judgment as to all affirmative defenses arising from Defendants' argument that Clock Tower's bankruptcy plan modified their obligations as guarantors and (2) a determination that NRS § 40.495(4) does not apply to this case. (*See generally* ECF No. 34). At the scheduled evidentiary hearing, the Court concluded that it would wait to take evidence on the NRS § 40.495(4) issue until after BB&T's partial motion for summary judgment was fully briefed and decided. (Hr'g, Nov. 25, 2013, at 10:24 a.m.). The partial motion is now fully briefed, and BB&T has also filed a motion for summary

judgment on its claim for breach of the Guarantee, (ECF No. 53), which is likewise fully briefed. The Court now considers the pending motions.

## II.    LEGAL STANDARD

In reviewing a motion for summary judgment, the court construes the evidence in the light most favorable to the nonmoving party. *Bagdadi v. Nazar*, 84 F.3d 1194, 1197 (9th Cir. 1996). Pursuant to Fed.R.Civ.P. 56, a court will grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). Material facts are "facts that might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Id.*

The moving party bears the initial burden of identifying the portions of the pleadings and evidence that the party believes to demonstrate the absence of any genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). A party asserting that a fact cannot be or is genuinely disputed must support the assertion by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials" or "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(A)-(B). Once the moving party has properly supported the motion, the burden shifts to the nonmoving party to come forward with specific facts showing that a genuine issue for trial exists. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). "The mere existence of a scintilla of evidence in support

of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252. The nonmoving party cannot defeat a motion for summary judgment "by relying solely on conclusory allegations unsupported by factual data." *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Matsushita*, 475 U.S. at 587.

**III.   BB&T's Partial Motion for Summary Judgment (ECF No. 34)**

BB&T contends that it is entitled to summary judgment on (1) all of Guarantors' affirmative defenses that arise out of the bankruptcy proceedings and (2) Guarantors' claim that, pursuant to NRS § 40.495(4), any recovery against them must be offset by the fair market value of the Property as of the commencement of this action. The Court agrees with BB&T.

**A.  Affirmative Defenses Related to the Bankruptcy Plan**

Guarantors have asserted twenty-four affirmative defenses to BB&T's claims. (Answer, ECF No. 9, at 5–7). Most of these are mere boilerplate and give little hint of their underlying factual basis. (*See id.*). However, at least three of these defenses are premised on the proposition that the Guarantors' own obligations were modified by Clock Tower's Bankruptcy Plan. (*See, e.g.*, Affirmative Defenses 19–21, Answer, ECF No. 9, at 7). This proposition is not only inconsistent with the plain terms of the Guarantee, (Guarantee § 7, ECF No. 20-1, at 5 ("The obligations of Guarantor under this Guarantee shall not be altered, limited or affected by any proceeding, voluntary or involuntary involving the bankruptcy . . . of Borrower, or by any defense which Borrower may have by reason of any order . . . resulting from any such proceeding.")), it is also incorrect as a matter of well-settled law, *Star Phoenix Min. Co. v. W. Bank One*, 147 F.3d 1145, 1147 n.2 (9th Cir. 1998) ("It is also well-established that the

discharge of the principal debtor in bankruptcy will not discharge the liabilities of codebtors or guarantors . . . . This court has held that, under Section 524(e), a bankruptcy court does not have the power to discharge the liabilities of a bankrupt's guarantor." (internal citations omitted)). In fact, Guarantors concede this point in multiple filings. (*See, e.g.*, Opp'n to Mot. Summ. J., ECF No. 65, at 5 ("[I]t has been repeatedly recognized that bankruptcy courts do not directly affect independent guarantee agreements.")). Accordingly, the Court grants summary judgment as to any affirmative defense premised on the proposition that the Bankruptcy Plan somehow modified Guarantors' obligations.

**B. Applicability of NRS § 40.495(4)**

Guarantors' principal defense to this action is that, despite their promises in the Guarantee and BB&T's inability to realize the value of the Property through foreclosure, NRS § 40.495(4) prohibits this Court from rendering a judgment for more than "the amount by which the amount of indebtedness exceeds the fair market value of the property as of the date of the commencement of the action." (Demand for Hr'g, ECF No. 10, at 3 (citing NRS § 40.495(4))). While the Court acknowledges that it applied NRS § 40.495(4) in its order scheduling the evidentiary hearing, (*see* ECF No. 33, at 9), it now reconsiders, concluding that NRS § 40.495(4) is inapplicable to the instant action.

On June 10, 2011, after Clock Tower's April 2011 default, Nevada enacted NRS § 40.495(4) as part of Assembly Bill 273 ("AB 273"). NRS § 40.495(4) provides as follows:

> 4. If, *before a foreclosure sale of real property, the obligee commences an action against a guarantor*, surety or other obligor, other than the mortgagor or grantor of a deed of trust, *to enforce an obligation to pay, satisfy or purchase all or part of an indebtedness or obligation secured by a mortgage or lien upon the real property*:
>
> (a) *The court must hold a hearing* and take evidence presented by either party concerning the fair market value of the property as of the date of the

commencement of the action. Notice of such hearing must be served upon all defendants who have appeared in the action and against whom a judgment is sought, or upon their attorneys of record, at least 15 days before the date set for the hearing.

(b) *After the hearing, if the court awards a money judgment against the guarantor, surety or other obligor who is personally liable for the debt, the court must not render judgment for more than*:

(1) *The amount by which the amount of the indebtedness exceeds the fair market value of the property as of the date of the commencement of the action* . . .

(emphasis added).

In this case, Guarantors allege that, as of the date of the commencement of this action, the value of the Property has dramatically increased such that it exceeds their indebtedness under the Guarantee. (Reply, ECF No. 21, at 5). Thus, they argue, § 40.495(4) prevents BB&T from collecting any judgment against them. (*Id.*). BB&T rejects this contention, raising contractual, interpretational, and constitutional arguments against the retroactive application of § 40.495(4). (*See* Partial Mot. Summ. J., ECF No. 34). Specifically, BB&T contends that § 40.495(4) is inapplicable because: (1) Guarantors have expressly waived their right to assert it as a defense; (2) it cannot apply where a bankruptcy plan prohibits the creditor from foreclosing on the subject property without leading to absurd results and abrogating NRS § 40.475; and (3) its retroactive application to the Guarantee would violate the Contract Clause of the U.S. Constitution. (*Id.* at 19–40). In response, Guarantors argue that: (1) because BB&T failed to timely challenge § 40.495(4)'s applicability, it has waived its right to do so now; (2) Guarantors' contractual waiver of § 40.495(4)'s liability limits is unenforceable under NRS § 40.453; and (3) even if the Court concludes that § 40.495(4) is inapplicable, BB&T cannot sue Guarantors without first foreclosing on the Property. (Opp'n, ECF No. 47, at 3–23). The

Court agrees with BB&T in part, concluding that its arguments are not untimely and that while the contractual waiver is unenforceable, § 40.495(4) applies only to post-enactment guarantees.

### i. Timeliness of BB&T's Challenge

As a threshold matter, the Court rejects Guarantors' claim that BB&T irrevocably waived any right to challenge the § 40.495(4) defense by failing to raise its arguments in opposition to Guarantors' demand for a § 40.495(4) hearing, (*see* Opp'n, ECF No. 47, at 3–5), which Guarantors filed on the same day they filed their answer to the complaint, (Answer, ECF No. 9; Demand for Hr'g, ECF No. 10).

A finding of waiver, in this context, is within this Court's discretion. *Nw. Acceptance Corp. v. Lynnwood Equip., Inc.*, 841 F.2d 918, 926 (9th Cir. 1988) ("We review a district court's refusal to consider an untimely argument for abuse of discretion."). Although BB&T did not raise its arguments in its opposition to the demand for a hearing—a filing in which such arguments would have been appropriate—it filed the instant motion three days after the Court ordered the hearing. (*See* ECF No. 34). Guarantors do not argue that this brief delay, at such an early stage in the case, caused any prejudice. (*See* Opp'n, ECF No. 47, at 3–5). Nor could they. Instead, they contend that the mere failure to raise these arguments necessarily constitutes a waiver of the right to assert them. (*See id.*). While this might be true in some contexts, it is not the case here. Indeed, this is a somewhat complex case, and § 40.495(4) is a new statute, with very little judicial interpretation. Therefore, it would be manifestly unjust to impose such a harsh penalty for BB&T's innocuous failure to raise all of its arguments at such an early stage

in the litigation. Accordingly, the Court concludes that BB&T timely asserted its challenge to Guarantors § 40.495(4) defense.

### ii. Guarantors' Waiver

In section 5 of the Guarantee, Guarantors waived "any defense based upon any statute or rule of law which provides that the obligation of a surety must be neither larger in amount nor in other respects more burdensome than that of the principal" and "all rights and defenses arising out an election of remedies by Lender." (Guarantee § 5, ECF No. 20-1, at 4). BB&T now contends that any rights Guarantors may have under NRS § 40.495(4), arise from BB&T's election to commence an action against them before foreclosing on the Property. Guarantors do not dispute that their § 40.495(4) defense falls within the language of the Guarantee's waiver provisions. (*See* Opp'n, ECF No. 47, at 19). Instead, they argue that a waiver of § 40.495(4)'s protections is unenforceable under NRS § 40.453. (Opp'n, ECF No. 47, at 19).

NRS § 40.453 provides as follows:

1. It is hereby declared by the legislature to be against public policy for any document relating to the sale of real property to contain any provision whereby a mortgagor or the grantor of a deed of trust or a guarantor or surety of the indebtedness secured thereby, waives any right secured to him by the laws of this state.

2. A court shall not enforce any such provision.[1]

However, "[t]he language of NRS 40.453 is ambiguous to the extent that a strict application of the extremely broad language of NRS 40.453 would lead to an absurd result." *Lowe Enters. Residential Partners, L.P. v. Eighth Judicial Dist. Court*, 40 P.3d 405, 412 (Nev. 2002). In *Lowe*, the Nevada Supreme Court explained that "if the legislature actually intended to prohibit the

---

[1] NRS § 40.453 expressly excludes any waivers allowed by NRS § 40.495, but those subsections are not at issue here.

waiver of any right secured by law, then such things as arbitration agreements, forum selection clauses and choice-of-law provisions would be unenforceable. The Nevada Legislature could not have intended such a result when it enacted NRS 40.453." *Id.* Instead, "[§ 40.453] is part of the anti-deficiency statutes, and the obvious intent of the legislature was to preclude lenders from requiring *borrowers* to waive their rights under the *anti-deficiency statutes.*" *Id.* (emphasis added) (adopting this narrowed interpretation of § 40.453).

As an initial matter, the Guarantors are clearly not "borrowers" and therefore find no protection under *Lowe*'s narrowed interpretation of § 40.453. *See id.* Furthermore, the *Lowe* Court held that § 40.453 protects only the rights enumerated in the subchapter in which it appears, titled "Foreclosure Sales and Deficiency Judgments," and spanning §§ 40.451–40.463. *Id.* ("[W]e conclude that the comments solicited by the legislature during the hearing on the amendment to NRS 40.453 highlight the intent of the legislature to protect the rights created by Nevada's anti-deficiency legislation . . . . This conclusion is consistent with the fact that NRS 40.453 is codified in Chapter 40 of the Nevada Revised Statutes under the subheading 'Foreclosure Sales and Deficiency Judgments.'"). Thus, because § 40.495(4) falls outside of the anti-deficiency subchapter, its protections appear waivable under *Lowe.*

However, on May 29, 2014, well after the instant motion was fully briefed, the Nevada Supreme Court subtly retreated from *Lowe*'s restrictive interpretation of NRS § 40.453, holding that a guarantor's statutory right to be mailed a notice of default, which is codified at NRS § 107.095 (i.e., outside the anti-deficiency subchapter), "falls within the scope of NRS 40.453's prohibited waivers." *Schleining v. Cap One, Inc.*, 130 Nev. Adv. Op. 36 (May 29, 2014). In reaching this conclusion, the *Schleining* Court reasoned that "[w]hile NRS 107.095 is not codified in the same subchapter that this court explicitly mentioned in *Lowe*, NRS 107.095

relates to the same subject  matter and was enacted as part of the same bill that enacted NRS

40.453." *Id.* (citing 1987 Nev. Stat., ch. 685, §§ 6, 8, at 1643–45). Additionally, the Court

reasoned, "the legislative hearing minutes that this court relied on in *Lowe* to determine the scope

of NRS 40.453 included a discussion of the need to provide notice to guarantors in deficiency

proceedings codified in NRS 107.080, which would later be separated into NRS 107.095, as part

of that legislative scheme." *Id.* (citations omitted). Thus, *Schleining* appears to instruct that

while, as a general rule, § 40.453's anti-waiver provision reaches only the rights codified in the

anti-deficiency subchapter, it also applies where: (1) the statutory right at issue relates to the

same subject matter as the anti-deficiency statutes or (2) the enacting legislature obviously

intended for § 40.453 to apply.

  At a minimum, NRS § 40.495(4) satisfies *Schleining*'s first prong. NRS § 40.459, which

was also amended by section 5 of AB 273, codifies an anti-deficiency defense that is closely

related to the defense added by NRS § 40.495(4). Specifically, upon foreclosure, NRS §

40.459(a)-(b) limits a guarantor's liability to the lesser of (1) the indebtedness minus the fair

market value of the collateral at the time of sale; and (2) the indebtedness minus the actual sale

price. By comparison, § 40.495(4) imposes nearly identical liability limits in pre-foreclosure

actions against guarantors. That these two statutes relate to the same subject matter, protect

related rights, and advance related policy objectives cannot be reasonably disputed. Thus, this

Court predicts that the Nevada Supreme Court would hold, under *Schleining*, that the liability

limits imposed by § 40.495(4) are related to the limits codified in the anti-deficiency subchapter,

such that § 40.453 applies.[2] Therefore, the Court must conclude that Guarantors' waiver of a § 40.495(4) defense is unenforceable.

### iii.   The Contract Clause and Statutory Interpretation

BB&T next argues that even if Guarantors' waiver is unenforceable, § 40.495(4) cannot retroactively apply against the parties' pre-enactment Guarantee without running afoul of the Contract Clause of the U.S. Constitution. The Court, however, interprets § 40.495(4) to lack retroactive effect and therefore declines to reach the constitutional question.

This Court has already concluded that a sister statute, NRS § 40.459(1)(C), could not apply against pre-enactment agreements without violating the Contract Clause. *Eagle SPE NV I, Inc. v. Kiley Ranch Communities*, No. 3:12-CV-00245-RCJ-WGC, 2014 WL 1199595, at *7–15 (D. Nev. Mar. 24, 2014); *see also Wells Fargo Bank, N.A. v. Elefante*, No. 2:12-CV-01521-RCJ-CWH, 2013 WL 4506002, at *3 (D. Nev. Aug. 21, 2013). Like § 40.495(4), this statute was added to the NRS by section 5 of AB 273, and like § 40.495(4), it limits deficiency liability:

> 1. After the hearing, the court shall award a money judgment against the debtor, guarantor or surety who is personally liable for the debt. The court shall not render judgment for more than:
>
> > (c) If the person seeking the judgment acquired the right to obtain the judgment from a person who previously held that right, the amount by which the amount of the consideration paid for that right exceeds the fair market value of the property sold at the time of sale or the amount for which the property was actually sold, whichever is greater, with interest from the date of sale and reasonable costs
>
> whichever is the lesser amount.

---

[2] "When interpreting state law, federal courts are bound by decisions of the state's highest court. In the absence of such a decision, a federal court must predict how the highest state court would decide the issue using intermediate appellate court decisions, decisions from other jurisdictions, statutes, treatises, and restatements as guidance." *Strother v. S. California Permanente Med. Grp.*, 79 F.3d 859, 865 (9th Cir. 1996).

Nev. Rev. Stat. Ann. § 40.459(1)(c) (2011) (emphasis added). In other words, where § 40.459(1)(c) is applicable, deficiency upon foreclosure is limited to the lesser of: (1) the price of assignment minus the fair market value at the time of sale; and (2) the price of assignment minus the actual sale price.

Because of the functional similarities between § 40.495(4) and § 40.459(1)(c), the Court's Contract Clause analysis in *Kiley Ranch*, 2014 WL 1199595, at *7–15, applies with equal force against § 40.495(4), where, as here, its liability limits would thwart a party's reasonable expectations under a pre-enactment guarantee. Indeed, under the unique circumstances of this case, if § 40.495(4) does not apply, Guarantors are liable for the entire $3,488,129.29 debt under the terms of their unconditional promise and the laws existing at the time of execution. *See Forouzan, Inc. v. Bank of George*, 2012 WL 642548, at *2 (Nev. Feb. 27, 2012) ("[T]he fair-value defenses, which only apply when a creditor elects to foreclose, do not apply to this case."). In contrast, were the Court to conclude that § 40.495(4) is retroactive, and, as Guarantors contend, the fair market value of the Property exceeds their indebtedness, Guarantors' obligation would be reduced to nothing, despite BB&T's present inability to foreclose and the reduced value of its claims against Clock Tower. Such results would unquestionably represent a substantial impairment of the Guarantee. Moreover, even assuming, as Guarantors argue, that BB&T is entitled to bring a second action at the conclusion of the Bankruptcy Plan, (*see* Opp'n, ECF No. 47, at 13), the eight-year delay in payment would substantially impair BB&T's reasonable expectations under the Guarantee, which unconditionally promised that BB&T would be paid in full in 2011. Therefore, were the Court unable to comfortably interpret the statute as inapplicable to pre-enactment guarantees, it would

15

be inclined to adopt its reasoning in *Kiley Ranch* and find that § 40.495(4), as applied to the unique facts of this case, violates the Contract Clause. However, because the statute is readily susceptible to a saving interpretation, the Court can, and must, avoid the constitutional question. *See United States v. Jin Fuey Moy*, 241 U.S. 394, 401 (1916) ("A statute must be construed, if fairly possible, so as to avoid not only the conclusion that it is unconstitutional, but also grave doubts upon that score."); *Lyng v. Nw. Indian Cemetery Protective Ass'n*, 485 U.S. 439, 445 (1988) ("A fundamental and longstanding principle of judicial restraint requires that courts avoid reaching constitutional questions in advance of the necessity of deciding them.").

Both this Court and the Nevada Supreme Court have interpreted § 40.459(1)(c), and each has concluded that it does not apply to pre-enactment contracts. *Sandpointe Apts. v. Eighth Jud. Dist. Ct.*, 313 P.3d 849, 853 (Nev. 2013) (holding that § 40.459(1)(c) does not retroactively apply where the foreclosure sale occurred prior to AB 273's enactment); *Kiley Ranch*, 2014 WL 1199595, at *17–19 (relying on *Sandpointe* and concluding that § 40.459(1)(c) does not apply where a pre-enactment assignee engaged in a post-enactment foreclosure sale). The reasoning in these decisions applies with equal force to § 40.495(4).

As the *Sandpointe* Court noted, there is a heavy presumption against interpreting statutes to have any retroactive effect:

> The United States Supreme Court has explained that "the presumption against retroactive legislation is deeply rooted in our jurisprudence, and embodies a legal doctrine centuries older than our Republic." And, from this court's inception, it has viewed retroactive statutes with disdain, noting that such laws are "odious and tyrannical" and "have been almost uniformly discountenanced by the courts of Great Britain and the United States." Not surprisingly, once it is triggered, the presumption against retroactivity is given considerable force. Thus, as we have observed, a statute will not be applied retroactively
>
> unless [(1)] the Legislature clearly manifests an intent to apply the statute retroactively, or [(2)] "it clearly, strongly, and imperatively

appears from the act itself" that the Legislature's intent cannot be
implemented in any other fashion.

313 P.3d at 858–59 (citations omitted). Applying this presumption, the *Sandpointe* Court first

concluded that "there is clearly no evidence in the enactment language that shows the

Legislature's intent to apply NRS 40.459(1)(c) retroactively." *Id.* at 858 (citing 2011 Nev. Stat.,

ch. 311, § 7, at 1748). Because NRS § 40.459(1)(c ) (section 5 of AB 273) and NRS § 40.495(4)

(section 5.5 of AB 273) are subject to the same enacting provision, *see* 2011 Nev. Stat., ch. 311,

§ 7, at 1748 ("This section and sections 1 to 3, inclusive, 5, 5.5 and 5.8 to 6, inclusive, of this act

become effective upon passage and approval."), this Court reaches the same conclusion with

respect to § 40.495(4). Furthermore, nothing in the statutory scheme suggests that the

Legislature's intent can be realized only through retroactive application.[3] Therefore, the Court

has no reason to conclude that the statute overcomes the robust presumption against retroactivity.

Finally, as the *Sandpointe* Court noted, AB 273's subjective legislative history makes

clear that the bill was not meant to affect preexisting contracts. *Id.* at 859 ("Any lingering doubt

regarding whether the Legislature intended NRS 40.459(1)(c) to apply retroactively is quickly

put to rest by reference to its legislative history. Although the language of the enactment

provision is clear and unambiguous, and reference to legislative history is therefore generally not

needed . . . in this case it simply clarifies that there was no intent that NRS 40.459(1)(c) was

meant to apply retroactively. Throughout the various committee hearings, Assemblyman

Conklin, the sponsor of Assembly Bill 273, stated that the provisions could not be applied

---

[3] While it is undoubtedly true that the statute would have a broader impact if it were applied
retroactively, this does not imply that the Legislature's intent can be implemented only by
applying it retroactively. *Landgraf v. USI Film Prods.*, 511 U.S. 244, 285 (1994) ("It will
frequently be true . . . that retroactive application of a new statute would vindicate its purpose
more fully. That consideration, however, is not sufficient to rebut the presumption against
retroactivity.").

retroactively." (citation omitted)). Assemblyman Conklin was not only AB 273's sponsor, he was also the only member of the Legislature to discuss NRS § 40.495(4). When questioned during committee hearings, he specifically disavowed any intent for AB 273 to operate against pre-enactment contracts, citing the concerns that underlie the Contract Clause:

> **Assemblyman Segerblom:** Is this bill retroactive?
>
> **Assemblyman Conklin**: *No, it is not. You would be reaching back into contracts that were made under certain circumstances.* If that were done, who would ever want to sign a contract or do business in a state that would nullify contracts? Our laws should have been better, but we have also never been in the situation we are in today. . . . To *retroactively pass laws would set a remarkably dangerous precedent for individuals and businesses that enter into contracts because you will wonder how it can be enforced* or how it can change.[4]

Three days later, in a similar exchange, Assemblyman Conklin further emphasized this point:

> **Chair Atkinson:** So there is no retroactivity?
>
> **Assemblyman Conklin:** *There is no retroactivity in this bill.* It is simply all future action. We could debate this, but the retroactivity issue is a matter of contract. If Ms. Bustamante Adams and I enter into a contract, we do so under the environment of laws that we have at that time. *Those laws are part of the contract because they dictate how we draft the contract.* Business does not want to operate in an environment in which laws are changed to favor one or the other party after they enter into a contract. While on one hand it may be nice to retroactivate a law, the precedent it sets is enormous and probably highly detrimental to the business environment of Nevada.
>
> **Chair Atkinson:** *I agree with that assessment. I wanted to ensure we had that on the record* because I know it came up. I think it would be a nightmare to go backwards. I appreciate that and your work.[5]

---

[4] Mins. of the Meeting of the Assembly Committee on Commerce and Labor, 2011 Leg., 76th Sess. 7, Mar. 23, 2011, (Nev. 2011) (emphases added), *available at* http://tinyurl.com/AB273history.

[5] Mins. of the Meeting of the Assembly Committee on Commerce and Labor, 2011 Leg., 76th Sess. 1–13, Mar. 28, 2011, (Nev. 2011) (emphases added), *available at* http://tinyurl.com/AB273history.

Accordingly, AB 273's legislative history only reinforces this Court's conclusion that NRS § 40.495(4) was not intended to retroactively frustrate reasonable expectations under pre-enactment contracts.

The Court therefore rules that NRS § 40.495(4) applies only where the guarantee at issue was executed on or after AB 273's effective date. This interpretation follows naturally from the lack of any objectively retroactive language, the lack of any objective necessity for retroactive effect, and the clearly expressed subjective intent of the Nevada Legislature. Thus, the Court need not reach the Contract Clause question presented by the unique facts of this case. Finally, in concluding that NRS § 40.495(4) does not apply retroactively, the Court necessarily concludes that it is inapplicable to the pre-enactment Guarantee at issue here.

Not coincidentally, under the present circumstances, this result is consistent with § 40.495(4)'s obvious purpose, which is to ensure that a guarantor is not held liable for more than the lesser of: (1) the difference between the indebtedness and the fair market value of the collateral as of the date the action is commenced; or (2) the difference between the indebtedness and the actual foreclosure sale price. This is because NRS § 40.475 subrogates a guarantor to the creditor's rights where the guarantor has fully satisfied the underlying indebtedness. Indeed, upon full satisfaction of the Guarantee, Guarantors are entitled to enforce BB&T's rights against Clock Tower. Assuming that Clock Tower satisfies its obligations under the Bankruptcy Plan, Guarantors will be repaid according to BB&T's secured claim, which reflects the bankruptcy court's valuation of the Property, and BB&T's unsecured claim. Thus, they will take $297,045 more than the fair market value, as determined by the bankruptcy court. On the other hand, if Clock Tower defaults and Guarantors foreclose, they will take either more or less than what they owe under the Guarantee, depending on the value of the Property at the time of sale. If they take

more, all the better for them; if they take less, then the additional amount paid under the

Guarantee represents the permissible difference described at § 40.495(4)(b)(2). Accordingly,

even under the worst circumstances, and despite § 40.495(4)'s lack of retroactivity, Guarantors'

liability is ultimately limited to the difference between the indebtedness and the actual

foreclosure sale price. In contrast, were the Court to adopt Guarantors' position, BB&T would

collect only the reduced amount available under the Bankruptcy Plan, despite securing an

unconditional, pre-enactment Guarantee, and despite Guarantors' repeated reliance on the

Guarantee during the bankruptcy proceedings, (*see* Reply to Objection to Confirmation, ECF No.

43-6, at 6). Through the instant motion BB&T merely asks this Court to avoid such results by

holding Guarantors to their repeated promises. The Court will do so, and BB&T's partial motion

for summary judgment (ECF No. 34) is therefore granted.

**C.  Applicability of NRS § 40.495(3)**

Guarantors also contend that even if § 40.495(4) does not apply, BB&T cannot bring an

action against them without first foreclosing on the Property. (*See* Opp'n, ECF No. 47, at 13–

17).This is incorrect. The thrust of Guarantors' argument is that they are entitled to assert a one-

action defense under NRS § 40.495(3) because BB&T filed a notice of default in November

2011. (*See id.*).

NRS § 40.495(3) applies only where a creditor "maintains an action to foreclose."

Specifically, it provides that "[i]f the obligee *maintains* an action to foreclose or

otherwise enforce a mortgage or lien and the indebtedness or obligations secured thereby,

the guarantor, surety or other obligor may assert any legal or equitable defenses provided

pursuant to the provisions of NRS 40.451 to 40.4639, inclusive." (emphasis added). In

this case, BB&T did not *maintain* an action to foreclose. Indeed, Clock Tower filed for

bankruptcy two days after BB&T filed its notice of default, automatically staying the foreclosure process before any sale could be noticed. (Lukas Decl. ¶ 4, ECF No. 34-2). Thus, while BB&T may have satisfied the first prerequisite for foreclosure by filing a notice of default, it did not *maintain* a foreclosure action sufficient to trigger NRS § 40.495(3). *See Bank of the W. v. Great Falls Ltd. P'ship*, No. 2:09-CV-388-JCM-RJJ, 2012 WL 2415519, at *3 (D. Nev. June 26, 2012) (concluding the issuance of a notice of trustee's sale was insufficient to trigger NRS § 40.495(3)). Moreover, even if § 40.495(3) were applicable, it would provide Guarantors the right to assert only the deficiency defenses found in "NRS 40.451 [–] 40.4639." These defenses do not include the one-action right to insist on foreclosure, which is codified at NRS § 40.430. Furthermore, NRS § 40.495(2) provides that a guarantor may waive the right to a one-action defense, which Guarantors did. (Guarantee § 5(a), ECF No. 20-1, at 4 (waiving "any right provided by NRS 40.030, or any other statute . . . to require Lender to . . . exhaust any security held by Lender at any time or pursue any remedy in Lender's power before proceeding against Guarantor")). Finally, NRS § 40.430(6)(i) plainly provides that a creditor does not violate the one-action rule where, as here, a borrower's bankruptcy prevents enforcement of the mortgage.

## IV.    BB&T's Motion for Summary Judgment (ECF No. 53)

BB&T also seeks summary judgment on its claim for breach of the Guarantee and damages in the amount of $3,488,129.29. (Mot. Summ. J., ECF No. 53). Guarantors do not dispute that BB&T has set forth sufficient evidence of Guarantors' liability and the damages owed. (*See generally* Opp'n to Mot. Summ. J., ECF No. 60). In fact, Guarantors submit no evidence at all. (*Id.*). Instead, they assert two arguments: (1) that summary judgment is premature

because NRS § 40.495(4)'s set off must be applied; and (2) that they are entitled to Rule 56(d) relief to search BB&T's records for a written agreement promising to extend the term of the Clock Tower loan. (*Id.*).

The Court has already considered and rejected the first argument. *See supra* Part III.B. Furthermore, as this Court has previously held, § 40.495(4) does not address liability and does not prevent the entry of summary judgment on liability before an evidentiary hearing. *See Elefante*, 2013 WL 1819801, at *3. Instead, "if the statute applies, it only affects the amount owed under the guarant[ee]." *Branch Banking & Trust Co. v. Brown*, No. 3:12-CV-00644-HDM-VPC, 2014 WL 177534, at *2 (D. Nev. Jan. 13, 2014).

Guarantors' second argument is defective in numerous respects. For example, Guarantors do not even attempt to demonstrate how they are entitled to enforce this unexplained, purported modification agreement between Clock Tower and BB&T. They likewise fail to explain how such an extension could be enforceable following the confirmation of the Bankruptcy Plan. Indeed, even assuming that such a modification agreement exists, it is entirely unclear how it could affect Guarantors' obligations at this post-bankruptcy stage.

More importantly, however, the Court concludes that Guarantors are estopped from asserting any defense to liability under the Guarantee. "[F]ederal law governs the application of judicial estoppel in federal court." *Rissetto v. Plumbers and Steamfitters Local 343*, 94 F.3d 597, 603 (9th Cir. 1996). Judicial estoppel is invoked "not only to prevent a party from gaining an advantage by taking inconsistent positions, but also because of general considerations of the orderly administration of justice and regard for the dignity of judicial proceedings, and to protect against a litigant playing fast and loose with the courts." *Hamilton v. State Farm Fire & Cas. Co.*, 270 F.3d 778, 782 (9th Cir. 2001). "The application of judicial estoppel is not limited to bar

the assertion of inconsistent positions in the same litigation, but is also appropriate to bar litigants from making incompatible statements in two different cases." *Id.* at 783.

Courts consider three factors when deciding whether to apply judicial estoppel. *Id.* at 782–83. First, "a party's later position must be clearly inconsistent with its earlier position." *Id.* at 782. Second, the court determines "whether the party has succeeded in persuading a court to accept that party's earlier position, so that judicial acceptance of an inconsistent position in a later proceeding would create the perception that either the first or the second court was misled." *Id.* at 782. The third and final consideration is "whether the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair determent on the opposing party if not estopped." *Id.* at 783.

Each of these factors weighs towards an application of judicial estoppel. Indeed, the bankruptcy court approved the Bankruptcy Plan, over BB&T's objection, because of Guarantors' repeated claims that the Guarantee was a valid, alternative source of payment. (*See* Reply to Objection to Confirmation, ECF No. 43-6, at 6–7; Tr. of Proceedings, ECF No. 54-7, at 4–5; Order Confirming Plan of Reorganization ¶ 27, ECF No. 43-1, at 9). Now, however, Guarantors deny liability under the Guarantee and, in a disingenuous attempt to reconcile this obvious inconsistency, claim that they merely "represented to the [bankruptcy court] that BB&T's unsecured claim was different from the other unsecured claims because of the existence of the Guarantee, not because the Guarantors were liable under the Guarantee." (Opp'n to Mot. Summ. J., ECF No. 60, at 4 (emphasis omitted)). This is a distinction without a difference. Guarantors are estopped from denying liability under the Guarantee, and BB&T's motion for summary judgment (ECF No. 53) is therefore granted.

**CONCLUSION**

IT IS HEREBY ORDERED that Plaintiff's motion for partial summary judgment (ECF No. 34) is GRANTED.

IT IS FURTHER ORDERED that Plaintiff's motion for leave to file excess pages (ECF No. 35) is GRANTED.

IT IS FURTHER ORDERED that Plaintiff's motion for summary judgment (ECF No. 53) is GRANTED. Plaintiff is entitled to damages in the amount of $3,488,129.29. This case is closed, and the Clerk of the Court shall enter judgment accordingly.

IT IS SO ORDERED.

Dated:  _ June 9, 2014          _.

_____
ROBERT C. JONES
United States District Judge